UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
WILLIAM L. MCCOY,

              Petitioner,        <u>MEMORANDUM AND ORDER</u>

   -v-                         21-CV-1103 (JS)

NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION,

              Respondent.
------------------------------------X
APPEARANCES

For Petitioner:       William L. McCoy, <u>Pro Se</u>
                  25 Melville Park Road, Suite 207A
                  Melville, New York  11747

For Respondent:       Alfred J. Croce, III, Esq.
                  Suffolk County District Attorney's Office
                  210 Center Drive
                  Riverhead, New York  11901

SEYBERT, District Judge:

         Following a jury trial in 2016,[1] Petitioner William L.

McCoy (hereinafter, "McCoy" or "Petitioner") was convicted in

---

[1] Petitioner's trial took place from December 12 through 14, 2016. Transcripts of the proceedings are available in the Case Docket as follows:

| Proceeding | Date | ECF No. |
|---|---|---|
| Trial | 12/12/2016 | 10-1 at ECF pp.285-408 |
| Trial | 12/13/2016 | 10-1 at ECF pp.409-774 |
| Trial | 12/14/2016 | 10-1 at ECF pp.636-737 |
| Sentencing | 01/18/2017 | 10-1 at ECF pp.738-774 |

Hereafter, no reference to the relevant ECF Number will be made; rather, citations to the transcripts will be by the date in the following format: "MM/DD/YYYY Tr.," followed by the respective transcript's original page number.

Suffolk County of one count of Grand Larceny in the Third Degree (New York Penal Law ("Penal Law") § 155.35[1]). (12/14/2016 Tr. at 97.)  He was sentenced to six months of imprisonment, followed by five years of probation, and ordered to pay $50,000 in restitution. (01/18/2017 Tr. at 31.)

Presently before the Court is McCoy's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§ 2254") (hereinafter, "the Petition"), in which he raises two grounds for habeas relief: (1) the trial court's lack of meaningful response to the jury notes; and (2) ineffective assistance of counsel. (Pet., ECF No. 1, at 3-5.)  While Petitioner is not presently in custody, at the time he filed his Petition, his five-year-long probation, which was part of the conviction from which he seeks habeas relief, had not yet expired; further, at that time, he was incarcerated in Nassau County on an unrelated conviction.  For the reasons articulated herein, the Petition is DENIED in its entirety, and the case is dismissed.

<u>BACKGROUND</u>

I.   <u>The Offense and Trial</u>

Petitioner's conviction, subsequent incarceration, probation, and order to pay restitution resulted from misappropriation of funds belonging to Gaye Rose ("Gaye"), who testified against Petitioner at trial. Gaye met Petitioner through a mutual friend, from whom she learned Petitioner was an accountant

2

and purportedly an attorney.  (12/12/2016 Tr. at 29.)  Initially, in 2011, Gaye contacted Petitioner to assist her in resolving some tax issues.  (Id. at 29-30, 68, 111.)

Then, in April 2013 and unrelated to Gaye's tax issues, the Rose family received a $50,000 check from Bank of America (hereafter, the "Check"), made out to Myrtle Rose ("Myrtle"), Gaye's deceased mother.  (Id. at 31, 36.)  The Check was: dated April 12, 2013; valid for 90 days; and, issued to Myrtle as a settlement for being a victim of predatory lending.  (Id. at 31, 35-35, 76.)  However, since Myrtle was deceased, Gaye was unable to deposit or cash the Check (id. at 31-32); therefore, she contacted Petitioner's firm, McCoy Consultants (hereafter, the "Firm"), for assistance with cashing the Check (hereafter, the "Myrtle Matter") (id. at 32-33).  A Firm employee relayed to Gaye that he had spoken to McCoy about the Myrtle Matter, which could be resolved by: first, obtaining letters of administration (hereafter, "Letters"); then, opening an account and depositing the Check into it; and, finally, distributing the Check funds among the Rose siblings.  (Id. at 33.)  Further, for providing services in resolving the Myrtle Matter as outlined above, which would supposedly take approximately three months, the Firm would charge a $2,500 fee.  (Id. at 33, 38 113.)  Gaye agreed and had the Check mailed directly to the Firm, which the Firm confirmed receiving. (Id. at 33-34.)  In June 2013, the Letters were prepared, which

3

Petitioner reviewed; thereafter, they were sent to the court for processing. (Id. at 112-13.) Aware the Check had an impending expiration date, Gaye contacted the Firm shortly before the expiration date. (Id. at 120.) Bank of America refused to issue a new check extending the Check's date of expiration. (Id. at 120-21.) Then, on June 10, 2013, McCoy deposited the Check into his own account; the Firm received the Letters from the court in November 2013. (Id. at 76, 115.)

In January 2014, Gaye contacted the Firm for a status update; she was told there had been a delay due to a paperwork error. (Id. at 39.) Thereafter, via phone and email, Gaye had multiple communications with Petitioner trying to ascertain the status of the Check and funds. (Id. at 43-44, 48-49.) Eventually, she received a copy of the processed Letters from her sister and forwarded them to Petitioner. (Id. at 50-52.) Gaye's sister learned from a Georgia[2] court that there were no errors in the filed paperwork. (Id. at 51.) In a May 1, 2014 email, Petitioner confirmed to Gaye that the processed Letters forwarded by her were the same as the original copies he had received from the courts. (Id. at 56.) On May 2, 2014, Rose wrote to Petitioner:

> According to the court's documents, the funds were released in November 2013. If the documents are valid, typically the funds should have been released in November 2013.

---

[2] When she passed away, Myrtle had been in the state of Georgia.

> The discrepancies about this matter are disturbing.

(Id. at 56-57). The same day, Petitioner responded:

> Gaye, I'm afraid you're mistaken. There is not provision in the court's documents relating to funds being released. And I can assure you that I have not received them. This document merely references your ability to administer the estate. I know this is frustrating for you but I'm on this and will have this done soon.

(Id. at 57.) After an additional email exchange, in which Gaye requested a meeting with Petitioner to discuss the Myrtle Matter, Petitioner stated the documents required correction and the Check's funds were not yet distributed. (Id. at 58-59.)

Gaye's sister contacted the District Attorney's office and filed a complaint regarding the missing Check funds. (Id. at 59-60.) When contacted by the District Attorney's office, Gaye stated she was reluctant to go to police herself as she trusted Petitioner. (Id. at 60.) In a statement eventually made to the police, Gaye stated she never gave Petitioner permission to either keep the Check funds or spend any of those funds other than to distribute them among the Rose siblings. (Id. at 62.) As of the time of Petitioner's December 2016 trial, Gaye had not receive any funds from the Check. (Id.)

In addition to Gaye's trial testimony, the prosecution presented testimony of an investigative auditor, who reviewed Petitioner's business bank records and the Check, which contained

a stamp "Pay to the Order of Capital One, Melville, New York, For Deposit Only, McCoy Companies, Inc., Escrow Account." (12/13/2025 Tr. at 24-25.)  On July 10, 2013, the Check was deposited into Petitioner's Capital One account which, before the deposit, had a negative balance of $56.68.  (Id. at 28-29.)  The investigative auditor detailed for the jury various other deposits and withdrawals from the Capital One account and confirmed the $50,000 Check deposited into said account had been fully spent.  (Id. at 40.)

McCoy testified in his own defense.  He stated he had an accounting degree and a juris doctor; he also claimed he was an attorney, but not an "attorney at law."  (Id. at 49.)  Petitioner admitted both that he never passed the New York State bar exam and he did not have an accounting license.  (Id. at 95, 100.) Petitioner acknowledged he had an account called "escrow," yet explained it was not a true escrow account but, rather, a business account in which he held funds, including the Check funds, before distributing them to other accounts.  (Id. at 50-51.)  Petitioner testified Gaye told him to deposit the Check prior to its expiration date.  (Id. at 61.)  McCoy did so by signing the back of the Check with Myrtle's name, testifying he assumed Gaye realized this is what he would do.  (Id. at 62.)  Petitioner further testified he spent the deposited Check funds because he

needed the money in other pending matters, such as to pay late payroll and past-due office expenses; specifically, he stated:

> We had office expenses that were due, and I sat there, and against every fiber of my being, I really did not want to touch that money belonging to the Rose family, but I looked at my receivables and I said, okay, the letters of administration are going to take me about six months. Within the six months' time, I should be able to collect the receivables and replenish the money.

(Id. at 65.) Petitioner told the jury: he "made a manifestly wrong choice"; he planned to replenish the funds and even deposited $36,000 in the so-named "escrow" account; but, nonetheless, because of persistent business needs, he continued spending funds that did not belong to him. (Id. at 66-67.) Petitioner further insisted he believed the processed Letters, which were received by him in December 2013, were deficient, lacking necessary language. (Id. at 67, 69-71.) He denied this stance was a delay tactic on his part, but admitted he lacked the funds to distribute the $50,000 to the Rose siblings when he received said Letters. (Id. at 71.) In fact, by September 2013, that money had been fully spent. (Id. at 104.) Petitioner admitted: he did not communicate to Gaye that he spent the $50,000; did not have permission from Gaye to spend the $50,000; and, his email to Gaye assuring her that he had not release the $50,000 was untruthful. (Id. at 12-24.)

Despite his claims that he was working on resolving the Myrtle Matter paperwork issues, McCoy did not seek out Gaye—who had ceased reaching out to Petitioner in May 2014--until he learned about the criminal investigation into him.  (Id. at 74-78.)  At that point, McCoy claimed he attempted to contact Gaye; and, at trial, McCoy claimed he had the funds to pay the $50,000 since 2015.  (Id. at 78-81.)  Petitioner maintained: he never intended to permanently deprive Gaye of the $50,000; he intended to repay Gaye; and, the reason it took so long to have the funds available was the nature of his business.  (Id. at 82.)

After both parties rested, the trial court reviewed with counsel their proposed jury instructions.  (Id. at 182-84.) Defense counsel initially objected to the proposed larceny charge, but the trial court brought to the counsel's attention two different definitions of larceny.  (Id. at 184-89.)  Following summations, the trial court charged the jury.  With respect to the intent element of the Grand Larceny in the Third Degree count, the trial court provided the following instruction:

> "Intent," means a conscious objective or purpose.  Thus, a person acts with intent to deprive another of property or to appropriate the property to himself or a third person, when such person's conscious objective or purpose is to withhold the property, or cause it to be withheld permanently, or to exercise control over the property, or to aid a third person to exercise control over the property, or to dispose of the property, either for the benefit of himself or a third person, or under such

8

> circumstances as to render it unlikely that an
> owner will recover such property.

(12/14/2025 Tr. at 68.)  The trial court further instructed the jury:  "The crime of larceny is complete when the person has the intent to deprive the property permanently and that person wrongfully takes the property for any period of time, however temporary."  (Id. at 70.)  There were no objections to the charges as they were read.

During jury deliberations, multiple jury notes were sent to the trial court notes.  One note requested: "Please provide jury with the three elements of law to be considered for third degree larceny.  And their definitions."  (Id. at 79.)  In response, the trial court stated that it would read the definitions from the charge again, to which the defense counsel requested the court "make sure that definitions of intent were permanently deprived."  (Id. at 79.)  The trial court ruled it would re-read all of the grand larceny charge, "which has all the definitions in it."  (Id. at 80.)  There were no further objections; the trial court proceeded to re-read the definitions to the jury.  (Id. at 84-85.)

Another jury note requested "clarification of three points of definition of grand larceny three, with special attention to intent to pay back."  (Id. at 90.)  The trial court determined

it could only re-read the jury charge again, which it did and without objections from defense counsel. (Id. at 90-96.)

The jury found Petitioner guilty on one count of Grand Larceny in the Third Degree. (Id. at 97.) On January 18, 2017, Petitioner was sentenced to six months' incarceration, followed by five years' probation; he was also ordered to pay $50,000 restitution. (Id. at 31.)

## II. Direct Appeal

Petitioner appealed his conviction to the Appellate Division, Second Department. (Appellant's Br., ECF No. 10-2, at 1-26.) On appeal, he argued: (1) his right to a fair trial was prejudiced when the trial court failed to provide meaningful responses to the jury notes; and (2) if this issue was deemed unpreserved for appellate review, his counsel was ineffective for failing to object to the court's handling of the notes. (Id. at 11-20.) Petitioner additionally argued his conviction was not supported by legally sufficient evidence and the verdict was entered against the weight of the evidence. (Id. at 21-24.)

The Second Department found McCoy's jury notes claims were both unpreserved and without merit. See People v. McCoy, 180 A.D.3d 715, 716, 115 N.Y.S.3d 678, 678-79 (N.Y. App. Div., 2d Dept. 2020). It also found the prosecution had proven Petitioner's guilt beyond a reasonable doubt and the verdict was not against the weight of the evidence. See id. The Second Department did not

explicitly    address    the    ineffective    assistance    argument.
Thereafter, the Court of Appeals denied Petitioner's application
for leave to appeal. See People v. McCoy, 35 N.Y.3d 972 (2020).
It    also    denied    Petitioner's    pro se    application    for
reconsideration. See People v. McCoy, 36 N.Y.3d 1052 (2021).

III. Procedural History of the Instant Action

On March 8, 2021, McCoy timely filed the present § 2254
Petition seeking to vacate his conviction and sentence. (Pet.,
ECF No. 1.) Here, McCoy argues: (1) he was denied a fair trial
because the trial court failed to meaningfully respond to the jury
notes and this claim was either properly preserved or did not
require such preservation; and (2) his trial counsel was
ineffective for failing to object if such preservation was
required. (Id. at 3-5.) In opposition, the State, represented by
Suffolk County District Attorney Office, argues Petitioner's
claims are procedurally barred and/or without merit. (Opp'n, ECF
No. 9;[3] see also Opp'n Memo, ECF No. 9-1.) Petitioner replied,
reasserting his claims and arguing they are neither procedurally
barred nor meritless. (Reply, ECF No. 13.)

---

[3] For clarity, Respondent's Opposition is comprised of a "Return",
which is, in essence an Affidavit in Opposition (see ECF No. 9),
and a supporting Memorandum of Law (see ECF 9-1). Herein, the
Court cites to Respondent's Memorandum of Law as its "Opp'n Memo".

DISCUSSION

I.    The Applicable Law

A. Section 2254 Standard of Review

"It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States." Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002). Pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas court, when considering a claim that was decided on the merits in a state court proceeding, may grant relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or" (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000); see also McBride v. Perez, No. 13-CV-4792, 2015 WL 5245072, at *8

12

(S.D.N.Y. June 25, 2015) ("'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.'") (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).  The requirements set forth by the AEDPA are strictly construed and, by design, establish a barrier to federal habeas relief founded upon the principle that "[s]tate courts are adequate forums for the vindication of federal rights" and are "presumptively competent[] to adjudicate claims arising under the laws of the United States."  Burt v. Titlow, 571 U.S. 12, 19 (2013) (internal quotation marks and citation omitted).

Under § 2254(d)(1), a state court decision is considered "contrary to" federal law if it either "applies a rule that contradicts the governing law set forth in [the Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court] precedent."  Williams, 529 U.S. at 405-06.  "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"  Green v. Travis, 414 F.3d 288, 296 (2d Cir. 2005) (quoting Williams, 529 U.S. at 412 (alteration in original)).  By contrast, an "unreasonable application" of federal law occurs

13

where the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407-08. "The critical point is that relief is available under § 2254(d)(1)'s unreasonable application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." White v. Woodall, 572 U.S. 415, 427 (2014) (internal quotation marks and citations omitted).

Furthermore, a state court's determinations of factual matters are "presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006). A state court's findings of fact will be upheld "unless objectively unreasonable in light of the evidence presented in the state court proceeding." Lynn, 443 F.3d at 246-47 (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)). Thus, a federal court may overrule the state court's judgment only if "after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." Williams, 529 U.S. at 389.

B.  <u>Procedural Bars to Federal Habeas Review</u>

1.  <u>Failure to Exhaust</u>

A habeas petition will not be reviewed by the district court unless "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A). Exhaustion of the state remedies requires a petitioner to "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (internal quotation marks and citation omitted; alteration in original).  The state courts must have had "the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding," exhausting with this the state remedies. <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971).  To accomplish this, a state prisoner must "present the state courts with the same claim he urges upon the federal courts."  <u>Id.</u>

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

<u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).  In New York, a defendant must exhaust his claims by seeking leave to appeal in

15

the New York Court of Appeals.  See Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000).

### 2. State Procedural Requirements

A federal court "may not review federal claims that were procedurally defaulted in state court — that is, claims that the state court denied based on an adequate and independent state procedural rule." Davila v. Davis, 582 U.S. 521, 527 (2017); see also Jimenez v. Walker, 458 F.3d 130, 136 (2d Cir. 2006) ("[F]ederal courts may not review the judgment of a state court that 'rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision.'" (quoting Harris v. Reed, 489 U.S. 255, 260 (1989))).  This principle serves to "ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

A state procedural rule is adequate if it is "firmly established and regularly followed by the state in question." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks and citation omitted).  To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" by "'clearly and expressly' stat[ing] that its judgment rests on a state procedural bar." Harris, 489 U.S. at 261-63, 265 n.12.  Further, a state court's

16

reliance on an independent and adequate procedural bar forecloses habeas review even if the state court also rejected the claim on the merits in the alternative.  See, e.g., id., at 264 n.10 (explaining "a state court need not fear reaching the merits of a federal claim in an alternative holding" where it "explicitly invokes a state procedural bar rule as a separate basis for [its] decision" (emphasis in original)); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810 n.4 (2d Cir. 2000) ("[W]here a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."); Nowakowski v. New York, No. 13-CV-3709, 2018 WL 6421056, at *6 (E.D.N.Y. Dec. 6, 2018) (noting "[t]he bar applies even where the state court has also ruled in the alternative on the merits of the federal claim" (internal quotation marks and citation omitted)).

Notwithstanding the existence of a procedural bar to a claim under state rules, "a federal court may still review the claim on the merits [1] if the petitioner can demonstrate both cause for the default and resulting prejudice, or [2] if he [or she] can demonstrate that the failure to consider the claim will result in a miscarriage of justice." Petronio v. Walsh, 736 F. Supp. 2d 640, 654 (E.D.N.Y. 2010) (citing Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)).  As to the cause and resulting prejudice avenue, a "[c]ause may be demonstrated with 'a showing that the factual or legal basis for a claim was not reasonably available to

counsel, . . . or that 'some interference by state officials' made compliance impracticable, . . . [or that] the procedural default is the result of ineffective assistance of counsel.'" Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986) (citations omitted)).[4] As to prejudice, the petitioner must demonstrate more than "a possibility of prejudice," but rather that the errors below "worked to his actual and substantial disadvantage." Murray, 477 U.S. at 494 (internal quotation marks and citation omitted; emphasis in original).

***

Finally, "[t]he Court is mindful that, as with all pro se pleadings, a habeas petition filed pro se is to be construed liberally." Crowder v. Ercole, No. 09-CV-3401, 2012 WL 5386042, at *2 (E.D.N.Y. Nov. 2, 2012) (citation omitted); see also Alonge v. Chappius, No. 12-CV-542, 2019 WL 1642449, at *6 (E.D.N.Y. Apr. 16, 2019) ("[T]he court must interpret petitioner's pleadings as raising the strongest arguments they suggest"). Pro se status, however, "does not exempt a party from compliance with relevant

---

[4]    Although ineffective assistance of counsel may, in some circumstances, constitute cause for a default, the claim for ineffective assistance "generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" Edwards v. Carpenter, 529 U.S. 446, 452 (2000) (quoting Murray, 477 U.S. at 489); see also Pitre v. Griffin, No. 16-CV-6258, 2016 WL 7442653, at *11 (E.D.N.Y. Dec. 26, 2016) ("[T]he ineffective assistance claim must itself have been exhausted in the state court.").

18

rules of procedural and substantive law." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks and citation omitted).

### C.    Ineffective Assistance of Counsel Standard

Strickland v. Washington sets forth the relevant federal law governing claims of ineffective assistance of counsel. 466 U.S. 668 (1984). To prevail, a petition must establish (1) the "counsel's performance was deficient" and (2) "that deficient performance prejudiced the defense." Id. at 687. To make out a successful claim, both Strickland factors must be satisfied; a reviewing court is not required to "even address both components of the inquiry if the [petitioner] makes an insufficient showing on one." Id. at 697.

#### 1.    The Deficient Performance Factor

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 688). In evaluating this prong, "the court must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time,' and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"

19

Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 689).  Furthermore, "'[t]he failure of a lawyer to invoke meritless objections cannot constitute constitutionally deficient performance.'"  Parks v. Sheahan, 104 F. Supp. 3d 271, 285 (E.D.N.Y. 2015) (quoting Hicks v. Ercole, No. 09-CV-2531, 2015 WL 1266800, at *23 (S.D.N.Y. Mar. 18, 2015)).

### 2.  The Prejudice Factor

To make a sufficient showing of prejudice, a petitioner:

> must show that there is a reasonable
> probability that, but for counsel's
> unprofessional errors, the result of the
> proceeding would have been different.  A
> reasonable probability is a probability
> sufficient to undermine confidence in the
> outcome.  In making the determination whether
> the specified errors resulted in the required
> prejudice, a court should presume, absent
> challenge to the judgment on grounds of
> evidentiary insufficiency, that the judge or
> jury acted according to law.

Strickland, 466 U.S. at 694.

***

Furthermore, the "highly deferential Strickland standard is made doubly so on habeas review, as AEDPA requires deference to the state court's ruling."  Bogan v. Brandt, No. 11-CV-1550, 2017 WL 2913465, at *9 (E.D.N.Y. July 6, 2017) (internal quotation marks and citations omitted).  "Bearing this deferential standard in mind, it is unsurprising that 'the great majority of habeas petitions that allege constitutionally ineffective counsel' fail."

Miller v. LeClair, No. 20-CV-1546, 2024 WL 1797341, at *12 (E.D.N.Y. Apr. 25, 2024) (quoting Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001)).

## II. Application

Petitioner's challenge to his state court conviction and sentence centers on the trial court's handling of the jury notes. His argument is three-fold: (1) the trial court erred by not meaningfully responding to the jury notes when it simply re-read the jury charge to the jury; (2) this claim was properly preserved for appeal or otherwise did not require preservation; and (3) if the argument required preservation, his attorney was ineffective for failing to object and preserve the claim. (Pet. at 3-5; see generally Reply.)

As an initial matter, the Court is procedurally precluded from reviewing Petitioner's claim with respect to the trial court's alleged lack of meaningful response to the jury notes since the Second Department invoked an independent and adequate state law ground in rejecting the claim on direct appeal. See McCoy, 180 A.D.3d at 716. Specifically, the Second Department found "Petitioner's contention that the County Court failed to meaningfully respond to certain jury notes regarding the elements of grand larceny in the third degree is unpreserved for appellate review." Id. (citing New York Criminal Procedure Law ("C.P.L.") § 470.15(6)(a)). It is well-established that New York's

21

preservation requirement and the rejection by an appellate court to review unpreserved claims--including in the interests of justice under C.P.L § 470.15(6)(a)--constitutes an independent and adequate state law ground. See, e.g., People v. Mack, 27 N.Y.3d 534, 544 (N.Y. 2016) (finding, where error was not "a mode of proceedings error", appellate court erred in not requiring defendant to preserve for appellate review his contention regarding the trial court's failure to respond to the jury's note; holding, in the absence of preservation, there was no jurisdiction to review the defendant's claim re: jury's note); see also generally Fama, 235 F.3d at 809 ("Federal courts may not review state court decisions that rest on an adequate and independent state procedural default unless petitioner can show both cause and prejudice or a fundamental miscarriage of justice."); Riley v. Conway, No. 06-CV-1324, 2011 WL 839477, at *5 (E.D.N.Y. Mar. 7, 2011) ("As long as there is no pretense that the state court adopted its view in order to evade a constitutional issue, and the case has been decided upon grounds that have no relation to any federal question, [the federal habeas court will] accept the state court decision whether right or wrong." (quoting Garcia v. Lewis, 188 F.3d 71, 82 (2d Cir. 1999)) (cleaned up)).

Moreover, Petitioner's argument that his claim did not require preservation because it deprived him of "fundamental constitutional rights which requires no preservation for appellate

review" is neither legally nor factually supported.  "'A jury charge in a state trial is normally a matter of state law and is not reviewable on federal habeas corpus absent a showing that the alleged errors were so serious as to deprive defendant of a federal constitutional right.'"  Haynes v. Att'y Gen. of N.Y., No. 19-CV-1814, 2023 WL 2023 2021056, *8 (E.D.N.Y. Feb. 15, 2023) (quoting United States ex rel. Smith v. Montague, 505 F.2d 1355, 1359 (2d Cir. 1974); see also Corines v. Superintendent, Otisville Corr. Facility, 621 F. Supp.2d 26, 38 (E.D.N.Y. 2008) (finding, "[e]ven if the trial court's response to the jury question were in error, it did not have a 'substantial and injurious effect' on the verdict" (citing Fry v. Pliler, 551 U.S. 112 (2007)).  By merely repeating his prior unsupported claim that he was deprived of his constitutional right when the trial court re-read the definitions of the "intent" element of the grand larceny charge to the jury, Petitioner does not explain how this instruction "so infected the entire trial that the resulting conviction violate[d] due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973).  Petitioner fails to establish how the trial court's instructions to the jury provided in response to the jury notes requesting definitions of the elements of the crime were erroneous as a matter of state law; similarly, he fails to show how these were errors of constitutional magnitude.  Petitioner does not allege the court-provided jury charge was in any way non-compliant with Penal Law or jury pattern

23

instructions; instead, he simply claims "the court refused to entertain suggestions from defense counsel on the appropriate response to the notes." (Pet. at 3.) Without more, this speculative allegation, which is contradicted by the record, does not establish that the trial court's instructions were erroneous in any manner. Therefore, the Court declines to review Petitioner's procedurally barred and non-cognizable jury notes claim.

Finally, with respect to Petitioner's claim of ineffective assistance of counsel, Petitioner is unable to satisfy the heavy <u>Strickland</u> standard. <u>First, as to the deficient performance prong</u>: Petitioner is unable to demonstrate his counsel's performance fell outside the broad range of acceptable attorney performance since his counsel had no grounds to object to the trial court's re-reading the jury charge in response to the jury notes requesting definitions of the elements of the crime of which Petitioner stood accused. In the first note, the jury specifically requested the re-reading of the elements of the crime and not a clarification. In the second note, the jury asked for clarification of the elements of the crime with special attention to "intent to pay back". Respondent argues "defense counsel's decision not to object to the court's jury note responses amounts to a clear tactical decision." (Opp'n Memo at 18.) That is likely so. As Respondent persuasively contends: "[H]ad counsel objected

24

to the trial court's response and the court provided a specific instruction that "intent to pay back" is not an element of the crime--as requested by the People [T3.90]—[P]etitioner's defense would have been weakened." (Id.)  Moreover, defense counsel "had a clear strategy to attack the permanent deprivation element of grand larceny by arguing that [Petitioner's] taking [of the $50,000] was merely temporary." (Id.)  As Respondent asserts, from the context of the jury notes, it appears "the jury was considering that defense." (Id.)  The Court finds this argument meritorious.  Indeed, defense counsel's strategic choice, even if Petitioner disagrees with it, does not constitute constitutionally deficient performance under Strickland.  See, e.g., People v. Benevento, 91 N.Y.2d 708,  712-13 (N.Y. 1998) (instructing defendant must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged shortcomings and stating "a simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after the trial, does not suffice" to make showing of ineffective assistance of counsel (further citation omitted)); People v Clark, 220 N.Y.S.3d 177, 181, 2024 WL 4507584 (N.Y. App. Div. 3rd Dept. Oct. 17, 2024) ("To put it simply, disagreement with the way trial counsel executed a defense strategy does not equate to ineffective assistance . . . .").

25

Second, with respect to the prejudice prong: Petitioner is unable to show how the outcome of the trial, or his appeal, would have been different had defense counsel objected to the trial court's response to the jury notes and its re-reading of the jury charge. Rather, the Court agrees with Respondent:

> [G]iven the overwhelming evidence of [P]etitioner's guilt, which was established through witness testimony, as well as forensic financial evidence, the jury rejected [P]etitioner's defense. Therefore, there is no reasonable probability that had counsel objected to the trial court's handling of the jury notes, the verdict would have been different.

(Opp'n Memo at 20 (citing Davis v. Johnson, 125 F. App'x 353 (2d Cir. 2005) (holding no reasonable probability outcome of trial would have been different if proffered testimony given)).) Moreover, the Second Department found Petitioner's claim with respect to the jury notes was without merit. See McCoy, 180 A.D.3d at 716. And, as addressed supra, upon review of the record evidence, this Court finds no constitutional violation in the state court's handling of the jury instruction and notes. Therefore, Petitioner's claim of ineffective assistance of counsel fails under Strickland.

***

To the extent not explicitly articulated herein, the Court has considered Petitioner's remaining arguments in support of habeas relief, but finds them to be without merit.

26

<u>CONCLUSION</u>

Accordingly, for all the foregoing reasons, **IT IS HEREBY ORDERED** that the Petition (ECF No. 1) is **DENIED**.  The Clerk of the Court is directed to: dismiss the Petition; close the case; and, mail a copy of this Order to Petitioner; and

**IT IS FURTHER ORDERED** that the Court:

I.   Declines to issue a certificate of appealability because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2); and

II.   Pursuant to 28 U.S.C. § 1915(a)(3), certifies that any appeal from this Order would not be taken in good faith, and, therefore, <u>in forma pauperis</u> status is denied for the purpose of any appeal. See <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

_/s/_ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:   June 12, 2025
        Central Islip, New York